DICKINSON WRIGHT PLLC
1850 North Central Avenue, Ste. 1400
Phoenix, Arizona 85004
(602) 285-5000

HUGHES HUBBARD & REED LLP
One Battery Park Plaza
New York, New York 10004
(212) 837-6000

Attorneys for Defendants Uranium Energy
Corporation and UEC Concentric Merge Corporation

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

Westminster Securities Corporation,

        Plaintiff,

        vs.

Uranium Energy Corporation and UEC
Concentric Merge Corporation,

        Defendants.

---

Case No. 15 CV 04181 (VM)


**DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF**
**<u>DEFENDANTS' MOTION TO DISMISS THE COMPLAINT</u>**

**TABLE OF AUTHORITIES** ............................................................................................................ 3
**INTRODUCTION** ........................................................................................................................... 5
**FACTUAL BACKGROUND** .......................................................................................................... 5
    I.   The Concentric Warrants. ................................................................................................ 6
    II.  The Merger and the UEC Exchange Warrants. ............................................................... 9
    III. The S-4. .......................................................................................................................... 11
    IV. The Yavapai County Action .......................................................................................... 11
    V.  This Action. .................................................................................................................... 12
**ARGUMENT** ................................................................................................................................. 12
    I.   The Elements of Novation. ............................................................................................ 12
    II.  The Complaint Alleges All Four Elements of Novation. .............................................. 14
**Conclusion** ..................................................................................................................................... 18

# TABLE OF AUTHORITIES

**Cases**

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009) .................................................................................................... 5

*ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*,
    493 F.3d 87 (2d Cir. 2007) ........................................................................................... 5

*Blair & Co., Inc. v. Otto*,
    171 N.Y.S.2d 203 (1st Dep't 1958) ............................................................................ 14

*Blue Tree Hotels Inv. (Can.), Ltd. v Starwood Hotels & Resorts Worldwide, Inc.*,
    369 F.3d 212 (2d Cir. 2004) ......................................................................................... 6

*C3 Media & Marketing Group, LLC v. Firstgate Internet, Inc.*,
    419 F. Supp. 2d 419 (S.D.N.Y. 2005) ................................................................... 13, 14

*Callanan Indus., Inc. v. Micheli Contracting Corp.*,
    508 N.Y.S.2d 711 (4th Dep't 1986) ........................................................................... 13

*Chappelow v. Savastano*,
    758 N.Y.S.2d 782 (Sup. Ct. 2003) ............................................................................. 13

*Global Network Commc'ns, Inc. v. City of New York*,
    458 F.3d 150 (2d Cir. 2006) ......................................................................................... 5

*In re Cohen*,
    422 B.R. 350 (E.D.N.Y. 2010) .................................................................................. 16

*Mallad Constr. Corp. v. County Fed. Savs. and Loan Ass'n*,
    32 N.Y.2d 285 (1973) ........................................................................................... 13, 16

*Muzak Corp. v. Hotel Taft Corp.*,
    133 N.E.2d 688 (N.Y. 1956) ...................................................................................... 17

*Northville Ind. Corp. v. Fort Neck Oil Terminals Corp.*,
    474 N.Y.S.2d 122 (2d Dep't 1984) ....................................................................... 13, 16

*Pani v. Empire Blue Cross Blue Shield*,
    152 F.3d 67 (2d Cir. 1998) ......................................................................................... 14

*Sira v. Morton,*

    380 F.3d 57 (2d Cir. 2004) ................................................................................................ 5

*Town & Country Linoleum & Carpet Co., Inc. v. Welch,*

    392 N.Y.S.2d 517 (4th Dep't 1977) ................................................................................. 13

*Wasserstrom v. Interstate Litho Corp.,*

    495 N.Y.S.2d 217 (2d Dep't 1985) .................................................................................. 16

## INTRODUCTION

Defendants Uranium Energy Corporation ("UEC") and UEC Concentric Merge Corporation ("Concentric Merge") (hereafter collectively, "Defendants"), through its undersigned counsel, hereby submit this memorandum of law in support of Defendants' motion to dismiss the Complaint (hereafter, this "Memorandum") filed by Plaintiff Westminster Securities Corporation. Plaintiff's Complaint should be dismissed because it is based upon a contract that the Complaint acknowledges has been <u>replaced</u> by a subsequent contract, the terms of which are controlling and dispositive of Plaintiff's claims. The Complaint (and/or the documents referenced therein or subject to judicial notice) allege all of the elements of <u>novation</u>, and Plaintiff's claims are accordingly barred. Plaintiff's blatant attempt to obtain a windfall of tens of millions of dollars from the Defendants as additional compensation for its services as a broker on behalf of a defunct entity with which Defendants merged nearly four years ago is legally and factually defective.

## FACTUAL BACKGROUND

On a motion to dismiss under Rule 12(b)(6), although well-pleaded allegations in the Complaint are accepted as true, and all reasonable inferences drawn in favor of the Plaintiff, conclusory statements and legal conclusions are not entitled to any presumption of veracity. *Ashcroft v. Iqbal*, 556 U.S. 662, 678-79 (2009). The Court may also consider "statements or documents incorporated into the complaint by reference, legally required public disclosure documents filed with the SEC, and documents possessed by or known to the plaintiff and upon which it relied in bringing the suit." *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007); *Sira v. Morton*, 380 F.3d 57, 67 (2d Cir. 2004); *Global Network Commc'ns, Inc. v. City of New York*, 458 F.3d 150, 156 (2d Cir. 2006). Moreover, the court may also take

judicial notice of public records, which include complaints filed in state, as well as federal, court. *Blue Tree Hotels Inv. (Can.), Ltd. v Starwood Hotels & Resorts Worldwide, Inc.*, 369 F.3d 212, 217 (2d Cir. 2004) ("Our review is generally limited to the facts and allegations . . . in the complaint. . . . But we may also look to public records, including complaints filed in state court, in deciding a motion to dismiss.").

A generous reading of the <u>well-pleaded</u> allegations in the Complaint, as well as the documents it relies on and pertinent public records, yields the factual allegations set forth below. This Memorandum, by setting forth certain of the factual allegations contained in the Complaint, does not concede the truth of those allegations; instead, as more fully demonstrated in the Argument section, this Memorandum demonstrates that the well-pleaded factual allegations of the Complaint (even if they were true) are insufficient to support the claims being asserted in the Complaint and that the Complaint must therefore be dismissed.

**I.     The Concentric Warrants.**

Plaintiff alleges that it provided certain financial services to Concentric Energy Corporation ("Concentric") in December 2008, specifically assisting with the sale of Concentric debentures. Compl. ¶ 6.[1] In connection with those services, Plaintiff received warrants from Concentric in December 2008 (the "Concentric Warrants"), permitting it to purchase a specified number of shares of Concentric common stock at a stated price (the "Exercise Price"). *Id.* The Concentric Warrants would expire on December 31, 2012 (the "Termination Date"). *Id.* A representative one of these Concentric Warrants is attached to the accompanying Declaration of Michael S. Rubin ("Rubin Decl.") Exhibit A.[2]

---

[1] Concentric is referenced in the Complaint as "CEC." Compl. ¶ 3. Defendants submit that it is less confusing to refer to this entity as "Concentric."

[2] Although the particular representative Concentric Warrant attached to the Declaration was issued to John O'Shea, rather than Plaintiff, Plaintiff admits that all of the Concentric Warrants

Plaintiff bases this action on two provisions of the Concentric Warrants.

*The Anti-Dilution Provision.* First, the Concentric Warrants contained an anti-dilution provision:

> If the Company or any Subsidiary thereof, as applicable, at any time while this Warrant is outstanding, shall sell . . . or issue . . . any Common Stock . . . at an effective price per share less than the then Exercise Price (such lower price, the "*Base Share Price*" and such issuance collectively, a "*Dilutive Issuance*") . . . then the <u>Exercise Price shall be reduced</u> to equal the share price divided by .9. Additionally, the <u>number of Warrant Shares issuable hereunder shall be increased</u> such that the aggregate Exercise Price payable hereunder, after taking into account the decrease in the Exercise Price, shall be equal to the aggregate Exercise Price prior to such adjustment.

Concentric Warrant, Section 3(b) (the "Anti-Dilution Provision") (italicized emphasis in original; underlined emphasis supplied). *See* Compl. ¶ 7.[3]

*The Cashless Exercise Provision.* Second, the Concentric Warrants contained a provision for an automatic "cashless exercise" of any portion thereof which had not been exercised on the expiration date of the Concentric Warrants, December 31, 2012. Thus, Section 2(c) of the Concentric Warrant described an option and a formula for cashless exercise, and provided:

> Notwithstanding anything herein to the contrary, on the Termination Date, this Warrant shall be automatically exercised via cashless exercise pursuant to this Section 2(c).

Concentric Warrant, Section 2(c) (the "Cashless Exercise Provision"). *See* Compl. ¶ 11.

The Concentric Warrants also contained a provision for their complete replacement and surrender in the event of a merger. Section 3(e) of the Concentric Warrants provided that, upon

---

were identical in all respects except the number of shares into which they were exercisable. Compl. ¶ 6. As noted below, Mr. O'Shea is the principal of Westminster. *See infra* note 5.

[3] For present purposes only, Defendants accept as true Plaintiff's allegation that a dilutive issuance occurred in 2009 and/or 2010. However, if the instant Motion is denied, Defendants will show that the stock issuances at issue were exempt from the Anti-Dilution Provision in lieu of officer/director compensation.

any merger of Concentric with or into another company (referred to as a "Fundamental Transaction"):

> [T]hen, upon any subsequent exercise of this Warrant, the Holder shall have the right to receive, for each Warrant Share that would have been issuable upon such exercise immediately prior to the occurrence of such Fundamental Transaction, the number of shares of Common Stock of the successor or acquiring corporation . . . and any additional consideration (the "*Alternate Consideration*") receivable as a result of such merger . . . by a holder of the number of shares of Common Stock for which this Warrant is exercisable immediately prior to such event.

Concentric Warrant, Section 3(e) (emphasis in original); *see* Compl. ¶ 9. In other words, as the Complaint alleges, the holder would receive, for each share of Concentric stock which the holder would otherwise have received upon exercise of the Warrants, that number of shares in the merged entity that a Concentric stockholder received for one share of Concentric stock under the terms of the merger agreement. Compl. ¶ 9. This merger right would be represented by replacement warrants:

> To the extent necessary to effectuate the foregoing provisions, any successor to the Company or surviving entity in such Fundamental Transaction <u>shall issue</u> to the Holder <u>a new warrant</u> consistent with the foregoing provisions and evidencing the Holder's right to exercise such warrant into Alternate Consideration.

Concentric Warrant, Section 3(e) (emphasis supplied); *see* Compl. ¶ 10. The replacement warrants were required to contain a similar provision for any further merger:

> The terms of any agreement pursuant to which a Fundamental Transaction is effected shall include terms requiring any such successor . . . to comply with the provisions of this Section 3(e) and insuring that this Warrant (or any such replacement security) will be similarly adjusted upon any subsequent transaction analogous to a Fundamental Transaction.

Concentric Warrant, Section 3(e); *see* Compl. ¶ 10. Thus, Section 3(e) required "replacement warrants" issued thereunder to (1) provide warrant shares at the same ratio for which a Concentric shareholder was receiving shares of the merged entity; and (2) provide a similar protection in the event of any subsequent merger. Compl. ¶¶ 9, 10. No other term of the

8

Concentric Warrants dictated the inclusion of any other of their provisions into the replacement warrants. *See* Concentric Warrant, Rubin Decl. Exhibit A. Without limiting the generality of the foregoing, nothing in Section 3(e) of the Concentric Warrants (relating to replacement warrants upon merger) required that replacement warrants include the Anti-Dilution Provision or the Cashless Exercise Provision from the Concentric Warrants.

## II.     The Merger and the UEC Exchange Warrants.

On or about September 9, 2011, Concentric merged with UEC pursuant to a Merger Agreement & Plan of Merger (the "Merger Agreement") dated May 5, 2011. Compl. ¶ 13. The Merger Agreement (specifically referenced in the Complaint ¶ 13) is Exhibit B to the Rubin Decl.

Consistent with the Section 3(e) of Concentric Warrants, the Merger Agreement stated a general Exchange Ratio of 0.1075 of one UEC share for each Concentric Share (the "Exchange Ratio"). Merger Agreement ¶ 1.1(x). This Exchange Ratio meant that the $1.00 price in the Concentric Warrants, when divided by 0.1075, would provide an exercise price of $9.30 per share for each UEC replacement warrant. The Merger Agreement specifically provided for the issuance of warrants replacing existing warrants (the "UEC Exchange Warrants"):

> [A]ll of the Concentric Warrants then outstanding will thereby be disposed of by the holders thereof in consideration for the issue of non-transferable common stock purchase warrants of UEC (the "*UEC Exchange Warrants*") . . . . The number of UEC Exchange Warrants issuable shall be determined with reference to the Exchange Ratio, *mutatis mutandis*. As of the Execution Date of this Agreement, the Exchange Ratio is 0.1075 of one UEC Share for every one Concentric Share. Accordingly, assuming the Exchange Ratio is the same at the Effective Time, a Concentric Warrant to acquire one Concentric Share would result in a UEC Warrant to acquire 0.1075 of one UEC Share, and the exercise price of each UEC Exchange Warrant shall be determined by dividing the per share exercise price of the corresponding whole Concentric Warrants by the Exchange Ratio.

Merger Agreement ¶ 2.2(d) (italicized emphasis in original). UEC accordingly promised in the Merger Agreement to "deliver agreements or certificates for UEC Exchange Warrants, as appropriate, to Concentric Warrant holders, as the case may be, in accordance with this Agreement, <u>against the delivery and surrender of the agreements and certificates representing the corresponding Concentric Warrants</u>." Merger Agreement ¶ 3.3(c) (emphasis supplied); *see* Compl. ¶¶ 13, 14. The Complaint acknowledges that the Concentric Warrants "would be exchanged for UEC Exchange Warrants." Compl. ¶ 13.[4]

The Complaint concedes that the UEC Exchange Warrants were issued pursuant to these provisions. Compl. ¶ 15. Attached as Exhibit C to the Rubin Decl. is a representative UEC Exchange Warrant. The UEC Exchange Warrant permitted the Holder to purchase a specified number of shares of UEC common stock at a stated price, based upon the exchange ratio provided for in the Merger Agreement. *See* UEC Exchange Warrant, operative language preceding Section 1. The Complaint does not allege any failure, in computing these amounts, to comply with the Exchange Ratio and/or the terms of the Merger Agreement. The UEC Exchange Warrants (like the Concentric Warrants they were replacing) would expire on December 31, 2012. UEC Exchange Warrant, Section 1(d). Also as required by the Concentric Warrant for replacement warrants, the UEC Exchange Warrants provided that, in the event of merger, the holders would, again, receive similar rights in the new company. UEC Exchange Warrant, Section 5(b). The UEC Exchange Warrants further provided that any action thereunder must be brought in Nevada. UEC Exchange Warrant, Section 11. Finally, the UEC Exchange Warrants reaffirmed that they completely replaced the Concentric Warrants:

---

[4] Significantly, the Complaint does not allege that Plaintiff ever objected to the merger or to any of its terms, or sought to exercise dissenting shareholders' rights as provided in ¶¶ 1.1(k) and 1.1(s) of the Merger Agreement.

> This Certificate contains the entire understanding among the Corporation and the Holder relating to the subject matter covered herein, and merges all prior discussions, negotiations and agreements, if any between them. Neither of the parties to this agreement shall be bound by any representations, warranties, covenants or other understandings relating to such subject matter, other than as expressly provided for or referred to herein.

UEC Exchange Warrant, Section 12.

### III. The S-4.

The Merger Agreement referred to the publicly-filed Form S-4 Registration Statement Under the Securities Act of 1933 ("S-4"), Merger Agreement ¶ 1.1(au), which would register the UEC Exchange Warrants Merger Agreement, ¶ 2.3. A copy of pertinent excerpts of the S-4 is attached as Exhibit D to the Rubin Decl. This publicly-filed S-4, in turn, confirmed, in at least six places, that the Concentric Warrants would be exchanged for UEC Exchange Warrants at the (defined) Exchange Ratio (and not at some other ratio). *See* S-4 pp. 2, 3, 5-6, 16, 20, and 22. The S-4 reiterated that the Concentric Warrants "will be disposed of by the holders thereof in consideration for the issuance by UEC of non-transferable common stock purchase warrants (the 'UEC Exchange Warrants')." *See* S-4 p. 44. The S-4 also advised in detail of dissenting shareholders' rights. *See, e.g.,* S-4 pp. 5, 7-8, 17, and 80-91.

The Complaint does not allege that Plaintiff ever objected to the S-4 or in any other fashion objected to the terms of the UEC Exchange Warrants which, by their terms, replaced its Concentric Warrants.

### IV. The Yavapai County Action.

On or about March 31, 2012, Plaintiff's principal O'Shea (with others) filed a Complaint against these Defendants (and others) in the Superior Court of Arizona, Yavapai County, a copy

of which is attached as Exhibit E to the Rubin Decl.[5] This Complaint alleged various claims relating to O'Shea's (and others') investments in Concentric. The Complaint in that action reveals that, on March 31, 2012, at the latest, Plaintiff (through its principal O'Shea) was aware of the specific issuances of stock by Concentric, which Plaintiff now alleges were "dilutive issuances," occurring in August 2009 and April 2010 (the allegedly "Dilutive Issuances"). *See* Yavapai County Compl. ¶¶ 80, 99. Yet, O'Shea and his fellow plaintiffs did not include any claim in that action regarding the allegedly Dilutive Issuances,[6] or otherwise take any action to exercise their rights under the Concentric Warrants or the UEC Exchange Warrants before they expired on December 31, 2012.

## V. This Action.

Plaintiff brought this action on or about June 1, 2015, claiming breach of the Anti-Dilution Provision and the Cashless Exercise Provision, both found in the Concentric Warrants.[7] Compl. ¶¶ 7, 11, 16, 17, 19. As a matter of law, however, Plaintiff cannot maintain this action based upon the Concentric Warrants, because the Concentric Warrants have been discharged through novation by the UEC Exchange Warrants. This action should be dismissed.

## ARGUMENT

## I. The Elements of Novation.

New York law recognizes the concept of novation, or the substitution of a new contract for an existing one, if four elements are present:

---

[5] One of the plaintiffs in that case, John P. O'Shea, is a principal of the Plaintiff herein. *See* Exhibit F of the Rubin Decl., from public records of the New York State Corporations Division.

[6] Plaintiffs in the Yavapai County action sought to add such a claim by Motion to Amend filed in March 2015, more than three years (at least) after they knew about the allegedly Dilutive Issuances. The Yavapai County Court denied the motion, presumably resulting in the filing of this action.

[7] This action is based entirely on the Concentric Warrants; Plaintiff does not allege any breach of the UEC Exchange Warrants. If Plaintiff were alleging a breach of the UEC Exchange Warrants, any such action would have to be brought in Nevada. UEC Exchange Warrant Section 11.

> A novation has four elements, each of which must be present in order to demonstrate novation: (1) a previously valid obligation; (2) agreement of all parties to a new contract; (3) extinguishment of the old contract; and (4) a valid new contract.

*Callanan Indus., Inc. v. Micheli Contracting Corp.*, 508 N.Y.S.2d 711, 712 (4th Dep't 1986) (citation omitted) (affirming summary judgment for defendant on novation defense).[8] Where novation is found, and a subsequent contract is substituted for a previous contract, the plaintiff may no longer sue for any alleged breach of the original contract but is limited to a remedy, if any, on the substituted contract. *See, e.g.*, *Northville Ind. Corp. v. Fort Neck Oil Terminals Corp.*, 474 N.Y.S.2d 122 (2d Dep't 1984) ("It is well settled that where the parties have clearly expressed or manifested their intention that a subsequent agreement supersede or substitute for an old agreement, the subsequent agreement extinguishes the old one and the remedy for any breach thereof is to sue on the superseding agreement.") (internal quotation marks and citations omitted); *C3 Media & Marketing Group, LLC v. Firstgate Internet, Inc.,* 419 F. Supp. 2d 419, 434 (S.D.N.Y. 2005). If a written agreement clearly indicates that it is intended to be a substitute contract for a previous agreement, the court should find novation as a matter of law. *See, e.g.*, *Mallad Constr. Corp. v. County Fed. Savs. and Loan Ass'n,* 32 N.Y.2d 285, 291 (1973) ("[W]here a question of intention is determinable by written agreements, the question is one of law . . . ."); *Chappelow v. Savastano,* 758 N.Y.S.2d 782, 786 (Sup. Ct. 2003) ("While the intention of the parties is often a question of fact, the court may determine the issue as a matter of law where the parties' intent can be determined from the writing itself."); *C3 Media,* 419 F. Supp. 2d 434 ("[W]here the parties have manifested their intent on the face of the document, the court can make this determination [whether there is a novation] as a matter of law based on the

---

[8] Some cases state, as an additional element, that there must be sufficient consideration, but those cases also indicate that consideration is "furnished by the discharge of the original obligation." *Town & Country Linoleum & Carpet Co., Inc. v. Welch,* 392 N.Y.S.2d 517, 517 (4th Dep't 1977) (citation omitted).

documents before the court."). The latter case described the type of language in a contract that would indicate a novation:

> A substitute agreement may be evidenced by language indicating that it supersedes and supplants the previous contract, completely replacing an old relationship with a new one.

419 F. Supp. 2d 434. In contrast, novation does not occur if the second agreement contains "language preserving existing claims until such performance [thereunder] is tendered." *Id.* Courts have granted motions to dismiss where the allegations of the complaint, and/or the documents it relies on, show a novation. *See, e.g.*, *Blair & Co., Inc. v. Otto*, 171 N.Y.S.2d 203 (1st Dep't 1958); *C3 Media*, 419 F. Supp. 2d 419.

In the instant case, all four requisite elements of novation are alleged in the Complaint, and/or supported by the documents on which the Complaint explicitly relies, and the Complaint should therefore be dismissed. *See, e.g.*, *Blair*, 171 N.Y.S.2d 203; *C3 Media,* 419 F. Supp. 2d 419; *accord Pani v. Empire Blue Cross Blue Shield,* 152 F.3d 67, 74 (2d Cir. 1998) ("An affirmative defense may be raised by a pre-answer motion to dismiss under Rule 12(b)(6), without resort to summary judgment procedure, if the defense appears on the face of the complaint.").

## II. The Complaint Alleges All Four Elements of Novation.

The elements of novation appear on the face of the Complaint as a matter of law. Plaintiff alleges that the Concentric Warrants were a *previously valid obligation* (*e.g.*, Compl. ¶¶ 6-12); that the parties *agreed to a new contract* (Compl. ¶¶ 13-14); and that the UEC Exchange Warrants were *a valid new contract* (*e.g.*, Compl. ¶¶ 15-19).

The Complaint also concedes that the UEC Warrants *were intended to extinguish*, and replace, the Concentric Warrants:

- Section 3(e) of the Concentric Warrants indicated that the merged entity "shall issue . . . a new warrant . . .," thus indicating they would be <u>replacement</u> warrants;

- Section 3(e) of the Concentric Warrants referred to "<u>replacement</u>" warrants;

- The Merger Agreement (Paragraph 2.2(d)) defined the new warrants as the "UEC <u>Exchange</u> Warrants" (emphasis supplied), thus confirming that the UEC Exchange Warrants would be <u>exchanged</u> for, and <u>replace</u>, the Concentric Warrants;

- The Merger Agreement (Paragraph 2.2(d)) required the Concentric Warrants to "be <u>disposed of</u>" – i.e., extinguished – in exchange for the UEC Exchange Warrants.

- The Merger Agreement (Paragraph 3.3(c)) required issuance of the UEC Exchange Warrants "against the delivery <u>and surrender</u> of the agreements and certificates representing the corresponding Concentric Warrants."

- The Complaint herein acknowledged that the UEC Exchange Warrants "<u>would be exchanged</u> for UEC Exchange Warrants." Compl. ¶ 13 (emphasis supplied).

- The UEC Exchange Warrants contained an explicit integration clause (Section 12), confirming that they merged "all prior . . . agreements" between the parties, and that no "covenants or other understandings" would be binding unless contained in the UEC Exchange Warrants.

- The S-4 reiterated (at p. 44) that the Concentric Warrants "will be <u>disposed of</u>" in exchange for UEC Exchange Warrants.

Plaintiff was aware of the Concentric Warrants, the Merger Agreement, the UEC Exchange Warrants, and the S-4, and knew exactly what it was getting in the UEC Exchange

15

Warrants. *See, e.g.*, *Northville*, 474 N.Y.S.2d 125 ("[O]ne who assents to a written contract is conclusively presumed to know its contents such that there can be no question of fact as to his understanding of its terms.") (citation omitted). It simply cannot be disputed that the Complaint, when taken together with the documents on which it explicitly relies, acknowledges that the UEC Exchange Warrants replaced and extinguished the Concentric Warrants. This action must be dismissed because the contracts upon which it is based (the Concentric Warrants) have been extinguished through novation by the UEC Exchange Warrants, and Plaintiff can no longer maintain any action on the Concentric Warrants as a matter of law.

Plaintiff may contend that, because the UEC Exchange Warrants did not incorporate the adjustments required by the Anti-Dilution Provisions in the Concentric Warrants, there was a breach of the Concentric Warrants, thus permitting this action thereunder. *See* Complaint, ¶¶ 10 and 15. This argument, however, fails as a matter of law. Numerous cases have held that substituted contracts extinguished not only the previous contracts, but also any claim for breach thereunder. *See, e.g.*, *Mallad Constr. Corp.*, 32 N.Y.2d 285; *Northville*, 474 N.Y.S.2d 122; *C3 Media*, 419 F. Supp. 2d 419.[9]

Indeed, *Northville* is somewhat similar to the instant case. There, the defendant breached a January 1979 agreement to sell a certain number of barrels of oil to the plaintiff. A subsequent agreement was reached in February 1979, which provided that it "shall be in lieu of and shall

---

[9] Defendants came across two cases that appear to suggest that a contract may not be the subject of novation after it has been breached, but Defendants respectfully suggest that these cases are not controlling. In one of them, *Wasserstrom v. Interstate Litho Corp.*, 495 N.Y.S.2d 217, 219 (2d Dep't 1985) the court granted summary judgment to plaintiff on defendant's defense of novation because defendant had <u>refused to sign</u> the allegedly substitute contract and thus could not rely on it. The court also appeared to say that novation cannot occur after a contract has been breached, 495 N.Y.S.2d 219, but the validity of this observation is doubtful in light of all of the cases previously cited in which novation <u>did</u> extinguish a contract even after it had been breached. The second case, *In re Cohen*, 422 B.R. 350 (E.D.N.Y. 2010) relied entirely on *Wasserstrom* for this point and is thus subject to the same doubt as *Wasserstrom*.

16

supersede any other agreements existing as of the date hereof" between the parties. 474 N.Y.S.2d 124. Plaintiffs sued under the January agreement, and claimed not only that it had been breached, but also that it was breached in bad faith. The court nonetheless held that the February agreement, on its face, was a substituted contract and that, accordingly, the January agreement was extinguished and plaintiff's only remedy was on the February agreement. Precisely the same result should obtain in the instant case.

Defendants also anticipate that Plaintiff may argue that a boilerplate provision in the Concentric Warrants required UEC to honor the provisions of the Concentric Warrants (including the Anti-Dilution Provision and the Cashless Exercise Provision on which its Complaint is based), even after the Concentric Warrants were extinguished. *See* Compl. ¶ 12, citing and quoting Section 5(k) of the Concentric Warrant (the "Successors Provision"). However, this argument would be unavailing. First, there does not appear to be any authority supporting the notion that certain provisions of a contract may survive after the contract is <u>extinguished</u> by novation.

Second, the Concentric Warrants stated <u>specifically</u> what terms were required to be carried forward into the UEC Exchange Warrants. *See* Concentric Warrant, Section 3(e). Neither the Anti-Dilution Provision nor the Cashless Exercise Provision were required provisions in the event of a merger. Specific terms in a contract control over potentially conflicting more general terms. *Muzak Corp. v. Hotel Taft Corp.*, 133 N.E.2d 688, 690 (N.Y. 1956).

Third, interpreting the Successors Provision in the manner urged by Plaintiff would be absurd. There are numerous provisions in the Concentric Warrants that simply would not logically be carried forward into exchange warrants issued as a result of a merger, including, for

example, the definition of Concentric as the "Company" (introductory paragraph before Section 1); the fundamental operative promise to issue <u>Concentric</u> shares upon exercise (*id.*); the Exercise Price (Section 2(b)); a provision relating to the purchase of debentures by Concentric's "founder," Ralph Kettell (Section 3(f)); and reference to a Concentric Purchase Agreement for definitions (Section 1) and for "questions concerning the construction, validity, enforcement and interpretation of this Warrant" (Section 5(e)). Thus, it cannot be that the Successors Provision in the Concentric Warrants required <u>all</u> of the terms thereof to be carried forward into exchange warrants issued pursuant to a merger. The only logical interpretation of the Successors Provision is that the terms of the Concentric Warrants were generally binding upon successors to Concentric, while the specific requirements of Section 3(e), specifying the terms of exchange warrants issued, pursuant to a merger (specifically, the Exchange Ratio and a similar merger protection provision) control as to such a transaction. Defendants <u>did</u> comply with those obligations.

## CONCLUSION

For the foregoing reasons, Defendants UEC and Concentric Merge respectfully request that all claims asserted against them be dismissed pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. This action, based entirely on a contract that the Complaint establishes has been extinguished and replaced, should be dismissed in its entirety.

DATED: New York, New York

July 15, 2015

Respectfully submitted,

DICKINSON WRIGHT PLLC

By: /s/ John Fellas
Michael S. Rubin, *Pro Hac Vice pending*
Anne L. Tiffen, *Pro Hac Vice pending*
Charles S. Price, *Pro Hac Vice pending*
1850 North Central Avenue, Ste. 1400
Phoenix, Arizona 85004
Telephone: 602-285-5000

John Fellas
Hagit Elul
HUGHES HUBBARD & REED LLP
One Battery Park Plaza
New York, NY 10004-1482
Telephone: 212-837-6000
Fax: 212-422-4726

Attorneys for Defendants Uranium Energy Corporation and UEC Concentric Merge Corporation

PHOENIX 55243-2 230772v5