


**LAW OFFICES**
**KENNETH A. ZITTER**
260 MADISON AVENUE
NEW YORK, NEW YORK 10016
(212) 532-8000

March 7, 2017

Honorable Victor Marrero
United States District Judge
United States District Courthouse
500 Pearl Street
New York, New York 10007

      Re: Westminster Securities Corporation *et al.* v. Uranium Energy Corporation *et ano.*
                              15 CV 04181 (VM) (GWG)

Dear Judge Marrero:

      We respond to the letter to Your Honor dated March 3, 2017 from Michael Rubin, Esq., Defendants' attorney, requesting a pre-motion conference to allow Defendants to move for summary judgment. As hereafter set forth, summary judgment is inappropriate because the evidence adduced by Defendants does not support summary judgment. Triable issues of material fact also preclude such relief.

      The terms of the CEC Warrants provided that if CEC issued any stock at an effective price lower than $1.00 per share, then the exercise price of the CEC Warrants would be adjusted downward to the price of the new issuance and the number of shares into which the CEC Warrants were exercisable would be commensurately increased. The CEC Warrants expressly provided that their terms were binding upon any successor and that the terms of the CEC Warrants could be amended only by a vote of two-thirds of the CEC Warrant holders. The CEC Warrants were never amended. Defendants do not dispute that Uranium Energy Corporation ("UEC") is the successor to CEC and, therefore, the warrants which UEC issued (the "UEC Warrants") were required to, but did not, contain all of the material terms of the CEC Warrants.

      Defendants argue that books and records of CEC reflect that the stock issued to officers and directors in August 2009 was in lieu of cash compensation at an effective price of $1.22 (Rubin letter, p. 2, last full paragraph). As a matter of law, therefore, no dilutive event occurred. Defendants are incorrect. The evidence shows that the only price the officers and directors paid for the stock issued to them in August 2009 was $0.001 per share. As a matter of law, therefore, there was a dilutive event entitling Plaintiffs to the relief they seek.

      The evidence which supports Plaintiffs' position is as follows: There is no dispute that on August 12, 2009, all of the officers and directors of CEC approved the issuance to themselves of 837,000 shares of stock for $0.001 per share in accordance with the terms of the Stock Purchase

Agreement ("SPA"). There was nobody independent to review the fairness of the stock issuance or to represent CEC's interests in the stock issuance. The issuance represented approximately 8% of CEC's then outstanding stock which all of the directors and officers were acquiring for nominal value.[1] That evidence alone is sufficient for the trier of fact to conclude that the officers and directors were acting to enrich themselves at the expense of the stockholders, in violation of the anti-dilution provisions of the CEC Warrants.

The evidence is clear that the officers and directors in fact paid only $0.001 for their shares. The SPA explicitly stated that the purchase price for the shares was $0.001. Most, if not all, of the officers and directors in fact issued checks to CEC to purchase their proportionate number of shares for $0.001. There is no other or further consideration set forth in the SPA which the directors or officers were required to pay (either in cash or services) in order to purchase their stock. The SPA contains an integration clause which would prevent Defendants from contending that the purchase price was anything more than $0.001.

But even if the integration clause in the SPA would not prevent testimony that, under the terms of the CEC Warrants, the "effective price" which the officers and directors paid for the shares was the cash purchase price ($0.001) plus services which the officers and directors rendered (as Defendants contend), the evidence is clear that the officers and directors did not render any additional services for those shares.[2] The officers and directors each signed three year employment/retention agreements at the end of 2007/beginning of 2008 which required them to render services to CEC for the term of the agreement for the compensation set forth therein. The email (enclosed herewith) in which Andy Simpson, CEC's President and a Director, sets forth the alleged additional services rendered by the directors to support the August 2009 stock issuances makes clear that at least two of the directors - Ronald Parratt and Richard Graff - received their shares for no additional services.[3] Thus there is simply no factual support to

---

[1] By way of contrast, the investors in the three prior financing rounds led by Plaintiff Westminster Securities Corporation ("Westminster") acquired approximately 7% of CEC for a $7 million investment.

[2] The CEC Warrants permitted the issuance of stock to officers and directors as an "exempt transaction" which would not trigger anti-dilution. Such an issuance, however, would need shareholder approval. The officers and directors, presumably, were concerned that the issuance to themselves of 8% of CEC for $837 would not likely be approved by the shareholders.

[3] Even with respect to Rock Hankin who received 244,000 shares in August 2009, the additional services set forth in the email are minimal at best. If the CEC shares were fairly valued at $1.22, as Defendants contend, then Hankin was to receive approximately $300,000 in value for those additional services. Simpson described those services as weekly calls, sometimes daily, that bear on corporate governance and travel to New York on several occasions in connection with the Traxys transaction. Defendants do not claim that such alleged additional work by Hankin was not in any event required by the terms of his original retention agreement. Considering that for

2

Defendants' claim that the overwhelming portion of the price for the shares was paid with "services." Finally, if the shares were issued for additional services, CEC would have issued a W2 for services and the officers and directors would have had to pay income taxes. No W2s were issued indicating that CEC did not in fact receive services in payment for the shares.

The evidence is clear that the shares issued in August 2009 were intended to make up for the loss in value of the shares already held by the officers and directors. The initial employment/retention agreements, in addition to cash compensation, also provided for a <u>one time</u> issuance of CEC stock. At the time the stock was initially issued, CEC had just completed a financing at $7 per share. Assuming that the stock was fairly valued at $1.22 per share in August 2009 (which it was not - its value was in all likelihood substantially lower), the value of the shares previously issued to the officers and directors had declined by 85%. Because no additional services were required to be rendered for the officers and directors to obtain their stock in August 2009, the only reasonable conclusion is that the stock was issued to them to make up for the decrease in value of their existing stock holdings - exactly what anti-dilution is designed to protect against.

Defendants also argue that Plaintiffs knew of the dilutive issuances prior to the merger and that their failure to assert their rights under the anti-dilution provisions of the CEC Warrants as well as their failure to exercise their UEC Warrants prior to December 31, 2012 is fatal to their claims (Rubin letter, p. 3, last full paragraph). Even assuming Plaintiffs knew about the dilutive issuances in August 2009 before the merger (which as hereafter set forth is not true) Defendants set forth no basis to support their contention that Plaintiffs were required to assert their rights under the anti-dilution provisions at any time prior to the expiration of the statute of limitations (which has not expired). Plaintiffs are not in any fiduciary relationship with UEC which, in the course of its merger due diligence, had full access to all of the CEC documents. UEC clearly testified that it was aware of the anti-dilution provisions and their effects but had concluded that no event had triggered those provisions. Defendants also provide no legal authority establishing that expiration of a warrant nullifies any prior accruing contract claims thereunder.

The evidence will establish that prior to the merger in September 2011, Plaintiffs had no knowledge that the UEC Warrants they would receive did not, as they were required to do, contain all of the material terms of the old CEC Warrants. Contrary to applicable securities regulations, UEC did not publicly disclose the terms of the UEC Warrants prior to the merger. Plaintiffs, after the merger, were required to surrender their CEC Warrants, which were cancelled, and received the new UEC Warrants without prior knowledge of their terms. When they did receive the UEC Warrants in December 2011/January 2012, they immediately commenced suit in Arizona in March 2012.

---

three years work under his original retention agreement Hankin was to receive $360,000 ($120,000 a year for three years), there does not seem to be any correlation between the minimal additional services allegedly rendered by Hankin and the $300,000 value allegedly attributed to those services by CEC. Thus there is no credible argument that Hankin's shares issued in August 2009 were issued for services.

3

r

The evidence will also establish that Plaintiffs had no knowledge until August 2014, in the course of document discovery in the Arizona lawsuit, that a dilutive issuance had occurred in August 2009. The fact that Plaintiffs' bankruptcy attorney, in the course of document production in the CEC involuntary bankruptcy, received a copy of the August 2009 board resolution approving the issuance of 837,000 shares does not establish, as a matter of law, that Plaintiffs or their attorney knew that a dilutive issuance had occurred in August 2009. Amir Adnani, UEC's Chief Executive Officer, testified unequivocally that those minutes alone are insufficient to conclude that a dilutive issuance had occurred. Without all of the other documents which were produced during the course of the Arizona lawsuit, it would not have been possible to conclude that a dilutive issuance had occurred (see Adnani deposition, p. 442, included herewith). Neither Plaintiffs nor their bankruptcy attorney can, therefore, be charged with knowledge that a dilutive event took place prior to the merger.

As Defendants admit, two necessary elements to establish a novation are that the parties agree to a new contract and that a valid new contract comes into being.[4] As noted above, Plaintiffs never agreed to accept the UEC Warrants - they were imposed upon Plaintiffs by the terms of the merger agreement and their terms were never publicly disclosed prior to the merger. Further, a valid new agreement did not come into being. The UEC Warrants did not contain all of the material terms of the CEC Warrants, as required. Thus Plaintiffs' receipt of the UEC Warrants does not constitute a novation at all and certainly not a novation as a matter of law.

The Court, therefore, should not entertain Defendants' proposed summary judgment motion.

Respectfully submitted,

Kenneth A. Zitter

KAZ/nr
by fax - 212-805-6382
cc: Michael Rubin, Esq.
    by email

The Clerk of Court is directed to enter into the public record of this action the letter above submitted to the Court by Plaintiff.

SO ORDERED.

3-7-17
DATE       VICTOR MARRERO, U.S.D.J.

---

[4] See the *Callanan Industries* case cited by Defendants at p. 4 of their March 3 letter.

4

with management. The presentation of our suggestion for share awards is an occasion for expressing appreciation. Instead we fumbled the pass in the midst of S-1 filing and business plan writing over the weekend and for the last few days. So from Lynn and me, first, thank you for your professionalism and your nerve. Second: the memo we sent you with th
is schedule is in the nature of our suggestion    --

The proposed new awards reflect our view on time spent, tasks executed, value added and risks taken.

Our sense is that among the independent directors we've called on Rock weekly, sometimes daily, to gut check issues that bear on corporate governance; and on several occasions asked Rock to travel to meet partners or advisors such as Traxys. We rely heavily on Dick's expertise and granular focus on accounting and SEC issues and his precise commentary on disclosure matters. This role is essential in our credibility as a user of professional Wall Street money such as Traxys. Absent Ron, we haven't an operational mine leadership presence in the company. We don't call on Ron that often but his professional authority is irreplaceable. I would rather reallocate my own shares than feel that anyone of you is disappointed in the way we've parsed this suggestion for compensation.

Thank you.

Andy

------------------------------------------------------------

HANKIN004830

Page 440

1  to go through?
2  A  I don't recall that detail.
3  Q  Well, you see where it says:
4     "Respectfully, and we defer to your legal
5     counsel on this, however, with 54% (and
6     more to come), voting lockups in place it
7     would be best if you didn't proactively
8     speak to Concentric shareholders going
9     forward."
10    Does that refresh your recollection that as of
11    May 5th, 2011, you already had sufficient votes
12    for the merger to go through?
13 A  I really don't recall. I mean, I'm looking at
14    the email that was from five years ago and the
15    email speaks for itself.
16 Q  Okay. All right. Let's just mark -- I want to
17    mark the next exhibit, UEC06618 to -06630. It
18    says, "lockup and pooling agreement"?
19 MR. O'SHEA: From this morning.
20 MR. ZITTER: That, I don't know.
21 MR. CAMPBELL: Yes, it's from this morning, John.
22    EXHIBIT 167: UEC06618 to UEC06630, lockup and
23    pooling agreement
24 MR. ZITTER:
25 Q  Mr. Adnani, I showed you what's marked

Page 441

1  exhibit 167 and ask you if you recognize that
2  document?
3  A  Looks like an UEC document lockup and pooling
4     agreement.
5  Q  And do you know if this is a document used in
6     connection with obtaining consent to the UEC
7     Concentric merger?
8  A  I don't recall if the specific document was
9     used, but perhaps.
10 Q  Do you recall there being the consent to the
11    merger being executed prior to the formal vote
12    on the merger?
13 A  I don't recall.
14 MR. ZITTER: Okay. Mr. Rubin, I would just ask, to
15    the extent you have signed copies of any lockup
16    and pooling agreements relating to the merger
17    that we be provided with those. Okay. If you
18    tell me where I have them, but I don't think we
19    do. We'll look for them, but I would like to
20    request signed copies of those documents,
21    please.
22 MR. RUBIN: We'll look.
23    REQUEST 1: Provide signed copies of any lockup
24    and pooling agreements relating to the merger
25 MR. ZITTER: Okay. I'm going to put you on mute for

Page 442

1  10 seconds and we may actually be finished.
2  Hello?
3  MR. RUBIN: Yes.
4  MR. ZITTER:
5  Q  One more quick question, please, on exhibit 156. [August 12, 2009 Board Minutes]
6  A  Go ahead.
7  Q  Is there anything on -- in those board minutes
8     which would lead you to conclude that Concentric
9     at that time had violated the anti-dilution
10    provisions of the plaintiff's warrants?
11 A  No, we wouldn't have read those board minutes on
12    their own. We would have read them with other
13    documents that we've already discussed.
14 Q  Okay. And is that true of the April 12th, 2010
15    board minutes also, that you need to read them
16    in connection with -- with other documents in
17    order to determine whether or not they violated
18    the anti-dilution provisions?
19 A  Yes.
20 MR. ZITTER: I have no further questions of
21    Mr. Adnani at this time.
22 MR. RUBIN: We'll read and sign. Thank you.
23 MR. ZITTER: Okay.
24 THE REPORTER: Could you stay on the line,
25    Mr. Zitter, for a second.

Page 443

1  MR. ZITTER: Sure.
2  THE REPORTER: I just want to --
3  MR. ZITTER: Nobody has ever asked me to do that
4     before.
5  THE REPORTER: I'll just let the videographer go off
6     the record first.
7  MR. RUBIN: I think you had better.
8  THE VIDEOGRAPHER: This concludes the deposition of
9     Amir Adnani. We're off the record. The time is
10    2:08 p.m. Thank you.
11    (PROCEEDINGS ADJOURNED AT 2:09 P.M.)
12    (TOTAL TIME: 3 HOURS, 43 MINUTES)

38 (Pages 440 - 443)