USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: March 2, 2018

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------X
:
WESTMINSTER SECURITIES CORP., :
DAVID R. HOLBROOKE, M.D., AWM :
HOLDINGS, LLC, and JOHN O'SHEA, :
:
                    Plaintiffs, :      15-cv-4181 (KBF)
:
                    -v- :      OPINION & ORDER
:
URANIUM ENERGY CORP., and UEC :
CONCENTRIC MERGE CORP., :
:
                    Defendants. :
:
------------------------------------------------------------------X

KATHERINE B. FORREST, District Judge:

      This breach of contract action concerns whether the anti-dilution provision of the Concentric Energy Corp. Common Stock Purchase Warrant (the "Concentric Warrant" or "Warrant Agreement") was triggered when equity was provided to corporate directors as non-cash consideration for continuing services.

      Plaintiffs argue that if Concentric Energy Corp. ("Concentric" or the "Company")[1] issued equity at a price lower than $1 during the term of the Concentric Warrant, such issuance triggered the warrant's anti-dilution provision. Plaintiffs further argue that once the anti-dilution provision was triggered, defendants were required to issue additional shares of Concentric's successor, Uranium Energy Corp. ("UEC"). According to plaintiffs, Concentric in fact made two separate "dilutive issuances"—in August 2009 and April 2010—but failed to

---

[1] Concentric Energy Corp. is the predecessor-in-interest to the named defendants herein, and the entity that allegedly made the dilutive issuances that form the basis of this action.

issue additional shares of UEC stock as contractually required. As a result, plaintiffs allege that they are entitled to millions of shares in UEC.

Defendants tell a very different story, and present several independent bases for dismissal of plaintiffs' claims. As an initial matter, defendants contend that the anti-dilution provision was never triggered; because the issuances included additional consideration in the form of continued board service, the "effective price" was necessarily higher than $1. Separately, defendants argue that the anti-dilution provision at issue has terminated, and that plaintiffs surrendered any rights that may have existed thereunder when they exchanged their Concentric Warrants for UEC Warrant Certificates ("UEC Certificates") in November 2011.

The parties have now filed dueling motions for summary judgment. (ECF Nos. 107, 111.) For the reasons set forth below, the Court finds that the outcome here is not a close call, and that defendants are correct on both points: the anti-dilution provision was never triggered, and any rights plaintiffs may have had under the Concentric Warrant terminated in November 2011. Accordingly, defendants' motion for summary judgment is GRANTED, and plaintiffs' motion is DENIED.

I. PROCEDURAL POSTURE

This is one of three separate actions filed by these plaintiffs seeking relief from UEC relating to warrants issued by Concentric:

- On June 16, 2010, three of the plaintiffs—John O'Shea ("O'Shea"), David Holbrooke ("Holbrooke"), and AWM Holding, LLC ("AWM")—together

with other debenture holders, filed an involuntary Chapter 7 bankruptcy petition against Concentric in the U.S. Bankruptcy Court for the District of Arizona.

- On March 29, 2012, O'Shea, Holbrooke, and AWM filed suit in the Superior Court of Arizona (the "Arizona Suit"), alleging that Concentric had fraudulently induced them to invest in it. That complaint included allegations relating to the August 2009 and April 2010 stock issuances, but did not make any explicit claim for breach of the anti-dilution provisions of the Concentric Warrants or the UEC Exchange Warrants.[2]

- On June 1, 2015, Westminster Securities Corp. ("Westminster")—which was not party in the Arizona suit—filed the instant action in the United States District Court for the Southern District of New York. Shortly thereafter, O'Shea, Holbrooke, and AWM filed a separate suit bringing substantially similar claims. A few weeks later, the judge who was presiding over both actions (the Hon. Victor Marrero) consolidated the two cases.

In March 2016, the Arizona Suit settled, and as a result plaintiffs released all claims except those asserted in this action. This action was transferred to the undersigned for all purposes on August 10, 2017.

---

[2] Plaintiffs to the Arizona Suit amended their complaint in 2013 but did not add claims relating to the anti-dilution provision. They amended again in 2015 and tried to add anti-dilution claims, but the Arizona state court denied that attempt as untimely.

3

II.	FACTS RELEVANT TO DISPOSITION[3]

   A.   The Issuances

Concentric was an early-stage uranium company created to mine and sell uranium deposits. In order to commence mining operations at a mine in Arizona (the "Anderson Mine"), Concentric needed to raise capital. As part of this effort, in 2007 it recruited three independent directors to serve along with inside officers on its board, and executed retention agreements with each. Those agreements entitled the directors to monthly cash payments and a one-time issuance of restricted common stock. Under the terms of the retention agreements, the directors were entitled to purchase the stock at a "par value" of $0.001 (a tenth of a penny) per share. Concentric referred to this nominal price as the "Purchase Price" in the retention agreements.

Concentric ultimately made four rounds of private offerings: the first in 2007, two rounds in 2008, and a final round in 2009. In mid-2007, Concentric retained Westminster to act as placement agent for the first round of financing. That round offered stock to investors at a price of $7.00 per share and closed on July 16, 2007. A year later, in July 2008, Westminster acted as placement agent for a second private offering priced at $3.00 per share.

In August 2008, Concentric was nearly out of cash. No longer able to pay the directors as outlined in the retention agreements, Concentric's board resolved to pay the directors in stock for a period of approximately one year, from October 2008–

---

[3] The following facts are uncontested unless otherwise noted.

4

November 2009. In addition, the board authorized the issuance of additional shares of restricted stock to retain the continued services of various employees, including inter alia certain officers and directors. Again, as in 2007, the directors were entitled to purchase their allocated shares at par value. In connection with both the 2007 and 2008 stock-based compensation awards, Concentric recorded expenses relating to the issued shares at prices consistent with those of the most recent private placement offerings; that is, $7.00 and $3.00 per share, respectively.

In December 2008, Concentric completed a third round of private placement financing. This time it issued debentures, and Westminster again acted as placement agent. The Warrant Agreement that is at issue in this case came into existence at this time. In connection with plaintiffs' investments in the debentures in December 2008, they received warrants for the purchase of Concentric stock pursuant to a "Concentric Energy Corp. Common Stock Purchase Warrant ("Concentric Warrant" or "Warrant Agreement"). By its terms, each Concentric Warrant had a termination date of December 31, 2012.

Concentric completed its fourth and final private placement on May 21, 2009. This offering included both stock and debentures, and the debentures were convertible to stock at a price of $1.22 per share.

In August 2009, Concentric was still unable to pay the directors' monthly cash fees (as called for by their retainer agreements), and it was additionally unable to pay the salaries of two executive officers. The record contains evidence supporting the inference that the independent board members were disinclined to

5

continue serving without payment. In consideration for continued service, Concentric's board agreed to pay them in stock. As it had in connection with prior stock-based payments, Concentric recorded its expenses in connection with this stock issuance based on the price of the most recent private placement. In this case, that issuance was the fourth and final placement in August 2009, which was made a price of $1.22 per share. Using that price, the number of shares provided to the directors was associated with an expense of $718,580.

One of plaintiffs' core arguments in this action concerns the terms of the 2009 stock issuance to the directors. It is undisputed that the stock issued pursuant to a "Restricted Stock Purchase Agreement" ("RSPA") that called for a per share purchase price of $0.001 (a tenth of a penny). According to plaintiffs, that amount is equivalent to the "effective price" referenced in the Concentric Warrants. As discussed below, plaintiffs' argument is incorrect.

In April 2010, Concentric entered into an agreement with a former executive to return to the Company. As a condition of his return, he required that he be able to reconstitute the board, and the Company agreed. As part of this arrangement, the board resolved to satisfy any issues that might exist relating to unpaid fees to directors and officers through March 31, 2010 by issuing additional shares of stock. The record reflects that the total amount owed to this group was $774,666.67. The company recorded the shares at a cost per share based on the year for which the compensation was owed. Thus, for instance, shares for 2008 compensation were associated with a cost of $3.00 per share, and shares for 2009 compensation were

6

associated with a cost of either $1.22 or $1.25 per share. Concentric settled the entirety of the outstanding compensation debt by issuing a total of 556,027 shares.

Another of plaintiffs' core arguments in this action concerns the April 12, 2010 board resolution that authorized the above stock issuance. These issuances were made for no further consideration by the directors. According to plaintiffs, there is no evidence that the directors provided "additional" services in connection with the 2010 issuance, and they were already obligated to provide director services at that time. Thus, according to plaintiffs, no additional price component should be considered applicable—that is, the "effective price" associated with the 2010 issuance should not be augmented by the value of their services.

B.  The Concentric/UEC Merger

In June 2010—that is, prior to the surrender of Concentric Warrants in November 2011—three of the plaintiffs herein (O'Shea, AWM, and Holbrooke) along with others commenced an involuntary bankruptcy proceeding against Concentric in Arizona. While that proceeding was ongoing, Concentric entered into merger negotiations with UEC, a publicly traded mining company. Concentric and UEC entered into a merger agreement on May 5, 2011. That agreement provided that following the merger, all holders of Concentric Warrants, including plaintiffs, would surrender their warrants according to a defined exchange ratio of 0.1075 (that is, roughly one UEC share for every 9.3 Concentric shares.) This ratio was disclosed publicly as part the filings associated with the merger agreement. A further public disclosure of the terms of this warrant exchange occurred on July 8, 2011, with

7

Concentric's release of an S-4 Registration Statement. That filing also contained a template UEC Warrant Certificate that contained the anticipated relevant terms. The UEC Warrant Certificate (the "UEC Certificate") that plaintiffs eventually received was substantively the same as that in the S-4.

The merger between Concentric and UEC closed on September 9, 2011. None of the plaintiffs objected to the merger. As discussed more fully infra, in November 2011, each of the plaintiffs completed and sent a "Letter of Transmittal" to UEC in which they explicitly surrendered their Concentric Warrants in exchange for UEC Certificates, allowing for the purchase of a certain number of shares of UEC stock. The UEC Certificates, like the Concentric Warrants, expired by their terms on December 31, 2012. No plaintiff exercised any rights under the UEC Certificates before they expired.

Several months after they had surrendered their Concentric Warrants for UEC Certificates (but prior to December 31, 2012, when the UEC Certificates expired), three of the plaintiffs herein (O'Shea, AWM, and Holbrooke), filed a lawsuit in Arizona state court (the "Arizona Suit"), alleging that they had been fraudulently induced to invest in Concentric. As previously noted, the Arizona Suit did not mention the anti-dilution provision, or assert that the conversion calculation for the UEC Certificate was incorrect. In March 2015, plaintiffs sought to amend the Arizona Suit to add a claim based on the anti-dilution provision, but the court denied the motion as untimely. This lawsuit followed, raising almost precisely those claims that the Arizona court refused to allow.

8

C. The Terms of the Concentric Warrants

The Concentric Warrants contain several provisions referenced by the parties in connection with this action. Plaintiffs are primarily focused on the so-called "anti-dilution provision." That provision is found in § 3(b) and provides, in relevant part:

> Subsequent Equity Sales. If the Company or any Subsidiary thereof, as applicable, at any time while this Warrant is outstanding, shall sell or grant any option to purchase, or sell or grant any right to reprice, or otherwise dispose of or issue (or announce any offer, sale, grant or any option to purchase or other disposition, other than the extension of the exercise dates of any warrants outstanding at the date hereof) any Common Stock or Common Stock Equivalents entitling any Person to acquire shares of Common Stock, at an effective price per share less than the Exercise Price (such lower price, the "Base Share Price" and such issuance collectively, a "Dilutive Issuance" ) (if the holder of the Common Stock or Common Stock Equivalents so issued shall at any time . . . be entitled to receive shares of Common Stock at an effective price per share which is less than the Exercise Price, such issuance shall be deemed to have occurred for less than the Exercise Price on such date of the Dilutive Issuance), then the Exercise Price shall be reduced to equal the Base Share Price divided by .9. Additionally, the number of Warrant Shares issuable hereunder shall be increased such that the aggregate Exercise Price, shall be equal to the aggregate Exercise Price prior to such adjustment.

(Decl. of Webster D. McBride Ex. 5 ("Concentric Warrant") § 3(b) at 7, ECF No. 106-10.) The "Exercise Price" of the Common Stock under the Concentric Warrant was defined as $1.00. (Concentric Warrant § 2(b) at 2.) The Concentric Warrant also provides certain rights in the event of what is defined as a "Fundamental Transaction" (that is, for instance, a merger). (Concentric Warrant § 3(e) at 9.) That provision states, in relevant part:

> If, at any time while this Warrant is outstanding, (i) the Company effects any merger or consolidation of the Company with or into another Person, (ii) the Company effects any sale of all or substantially all of its assets in one or a

9

> series of related transactions, (iii) any tender offer or exchange offer . . . is completed pursuant to which holders of Common Stock are permitted to tender or exchange their shares for other securities . . . (each "Fundamental Transaction"), then, upon any subsequent exercise of this Warrant, the Holder shall have the right to receive, for each Warrant Share that would have been issuable upon such exercise immediately prior to the occurrence of such Fundamental Transaction, the number of shares of Common Stock of the successor or acquiring corporation or of the Company, if it is the surviving corporation, and any additional consideration (the "Alternate Consideration") receivable as a result of such merger . . . To the extent necessary to effectuate the foregoing provisions, any successor to the Company or surviving entity in such Fundamental Transaction shall issue to the Holder of a new warrant consistent with the foregoing provisions and evidencing the Holder's right to exercise such warrant into Alternate Consideration. The terms of any agreement pursuant to which a Fundamental Transaction is effected shall include terms requiring any such successor or surviving entity to comply with the provisions of this Section 3(e) and insuring that this Warrant (or any such replacement security) will be similarly adjusted upon any subsequent transaction analogous to a Fundamental Transaction.

(Id.)   A further provision concerns a "Transfer of Warrant." That provision states, in relevant part:

> (a) <u>Transferability</u>. . . . [T]his Warrant and all rights hereunder . . . are transferable, in whole or in part, upon surrender of this Warrant at the principal office of the Company or its designated agent . . . Upon such surrender . . . the Company shall execute and deliver a new Warrant or Warrants in the name of the assignee . . . .
>
> (b) <u>New Warrants</u>. This Warrant may be divided or combined with other Warrants upon presentation hereof . . . together with a written notice specifying the names and denominations in which new Warrants are to be issued . . . Subject to compliance with Section 4(a), as to any transfer which may be involved in such division or combination, the Company shall execute and deliver a new Warrant or Warrants in exchange for the Warrant or Warrants to be divided or combined in accordance with such notice. All Warrants issued on transfers or exchanges shall be dated the original Issue Date and shall be identical with this Warrant except as to the number of Warrant shares issuable pursuant thereto.

(Concentric Warrant §§ 4(a),(b) at 11-12.)

D.  Plaintiffs Surrender Their Concentric Warrants for UEC Certificates

On November 15, 2011, O'Shea[4] voluntarily surrendered his Concentric Warrants in exchange for a specific number of warrant certificates issued by UEC. (Decl. of Webster D. McBride Ex. 64 ("Transmittal Letter"), ECF No. 110-89.)  The Letter of Transmittal (the "Transmittal Letter") accompanying that surrender recites that:

> This Letter of Transmittal is for use by registered holders ("Warrantholders") of common stock purchase warrants ("Warrants") of Concentric Energy Corp. (the "Company") in connection with the merger (the "Merger") of the Company and UEC Concentric Merge Corp. . . . a wholly owned subsidiary of UEC.

(Id. at 1.)  The Transmittal Letter also states:

> Warrantholders will be entitled to receive, in exchange for each one (1) Warrant of the Company, 0.1075 non-transferrable common stock purchase warrants of Uranium Energy Corp. ("UEC Exchange Warrants").

(Id.)  In executing the Transmittal Letter, O'Shea agreed that:

> The undersigned hereby delivers to UEC the following Warrant Certificates representing Warrants which the undersigned has full power and authority to deposit, sell, assign, and transfer.

(Id.)  O'Shea further indicated that warrants deposited were in the name of Westminster Securities Corp., and calculated that the number of shares issuable upon exercise of the deposited warrants (that is, the Concentric Warrants) as 204,349.  (Id.)  The Transmittal Letter also contains a number of representations, including that he had the full power and authority to deposit, sell, assign, and transfer the warrants being deposited.  (Id. at 2.)  In addition, the Transmittal

---

[4] The Court uses the O'Shea Letter of Transmittal and related documents as exemplars.  The parties agree that all plaintiffs executed and received similar documents.

11

Letter provides that "The above-listed Warrant Certificates are hereby surrendered in exchange for certificates representing UEC Exchange Warrants on the basis of 0.1075 UEC Exchange Warrants for every one (1) existing Warrant." (Id.) As the "undersigned," O'Shea "authoriz[ed] and direct[ed] UEC to issue a certificate for UEC Exchange Warrants to which the undersigned is entitled" and he calculated in handwriting that number as 21,968. (Id.) The "Instructions" accompanying the Transmittal Letter provide that "No alternative, conditional or contingent deposits of the Warrants will be accepted." (Id., § 4(b) at 6.)

UEC confirmed receipt of O'Shea's Letter of Transmittal on December 5, 2011. (Decl. of Webster D. McBride Ex. 66, ECF No. 110-91.) UEC's confirmation letter specifically references the anti-dilution provision contained in § 3(b) of the Concentric Warrants and adjustments made pursuant to such provision. (Id. at 1, 2.) The confirmation letter concludes by stating that enclosed "in exchange for the Concentric Warrants" are certain UEC Certificates, also expiring on December 31, 2012. (Id. at 2.)

In exchange for their Concentric Warrants, plaintiffs therefore received a defined number of UEC Certificates. UEC issued a UEC Warrant Certificate ("UEC Certificate") on September 9, 2011. (Reply Affirmation of Kenneth A. Zitter Ex. 3 ("UEC Certificate"), ECF No. 62-3.) The UEC Certificates each became void as of December 31, 2012. (UEC Certificate at 1.) The exercise of the UEC warrants was governed by the terms of the UEC Certificate. (UEC Certificate § 2(a) at 2.) Section

12 of the UEC Certificate states that it contains the "entire understanding" and provides:

> This Certificate contains the entire understanding among the Corporation [UEC] and the Holder relating to the subject matter herein, and merges all prior discussions, negotiations and agreements, if any between them. Neither of the parties to this agreement shall be bound by any representations, warranties, covenants or other understandings relating to such subject matter, other than as expressly provided for or referred to herein.

(UEC Certificate §12 at 7-8.)

III. LEGAL PRINCIPLES

    A.    <u>Summary Judgment Standard</u>

Summary judgment may be granted when a movant shows, based on admissible evidence in the record, "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the burden of demonstrating "the absence of a genuine issue of material fact." <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323 (1986). In reviewing a motion for summary judgment, the Court construes all evidence in the light most favorable to the nonmoving party, and draws all inferences and resolves all ambiguities in its favor. <u>Dickerson v. Napolitano</u>, 604 F.3d 732, 740 (2d Cir. 2010). The Court's role is to determine whether there are any triable issues of material fact, not to weigh the evidence or resolve any factual disputes. <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248-49 (1986).

13

B. <u>Basic Principles of Contract Interpretation</u>[5]

It is well established that "when parties set down their agreement in a clear, complete document, their writing should as a rule be enforced according to its terms." <u>W.W.W. Assoc., Inc. v. Giancontieri</u>, 77 N.Y.2d 157, 162 (1990). Accordingly, "[e]vidence outside the four corners of the document as to what was really intended but unstated or misstated is generally inadmissible to add to or vary the writing." <u>Id.</u> (citations omitted); <u>see also</u> <u>Weisberger v. Goldstein</u>, 242 A.D.2d 622, 623 (1997) ("[W]hen the terms of a written contract are clear and unambiguous, the intent of the parties must be found within the four corners of the contract, giving a practical interpretation to the language employed and the parties' reasonable expectations.") (internal quotation omitted).

When the parties' intent is clear—i.e., unambiguous—the contract "must be enforced according to the plain meaning of its terms." <u>Lockheed Martin Corp. v. Retail Holdings, N.V.</u>, 639 F.3d 63, 69 (2d Cir. 2011) (citing <u>South Rd. Assocs., LLC v. IBM</u>, 826 N.E.2d 806, 809 (2005)). A contract is unambiguous where the contract's terms have "a definite and precise meaning, as to which there is no reasonable basis for a difference of opinion." <u>Id.</u> (citing <u>White v. Cont'l Cas. Co.</u>, 878 N.E.2d 1019, 1021 (2007)). "Whether or not a writing is ambiguous is a question of

---

[5] In their respective summary judgment briefs, the parties rely exclusively on New York law for purposes of contract interpretation. Accordingly, the Court assumes the parties have agreed to the application of New York law to resolve disputes regarding the Concentric Warrants in this action. (<u>See</u> Mem. of Law ("Defs.' Mem.") at 22 n.15, ECF No. 109; <u>see also</u> Concentric Warrant § 5(e) at 14.) The Court notes that both the merger agreement and UEC Certificates appear to be governed by Nevada law.

14

law to be resolved by the courts." W.W.W. Assoc., Inc., 77 N.Y. 2d at 162 (citing Van Wagner Adv. Corp. v S & M Enters., 67 N.Y.2d 186, 191 (1986)).

IV. DISCUSSION

Plaintiffs' arguments fail for two independent reasons: (1) plaintiffs voluntarily surrendered their Concentric Warrants in 2011, thereby terminating the anti-dilution provision contained therein; and (2) plaintiffs' position requires the Court to interpret the term "effective price" as used in the Concentric Warrants as the absolute equivalent of a nominal "purchase price," but that ignores the clear difference in language used and the obvious intention that the two terms have different meanings. Plaintiffs have not offered any evidence to suggest that the term "effective" price was meant to be synonymous with "purchase" price. Plaintiffs' argument makes little sense and does not give effect to the plain language of the Concentric Warrants.

A. Voluntary Surrender

The merger between UEC and Concentric closed on September 9, 2011. As part of the merger, all Concentric Warrants—including those upon which plaintiffs' claims rely—were to be exchanged for new, UEC Certificates. The terms of the UEC Certificates were publicly available and known to plaintiffs before the closing. Plaintiffs did not object to the merger, nor to the terms of the new UEC Certificates. To the contrary, plaintiffs fully and formally surrendered their Concentric Warrants for UEC Certificates, even specifying the number of UEC Certificates to which they were entitled. That voluntary surrender extinguished whatever rights plaintiffs

15

may have had under the Concentric Warrants. Indeed, the terms of the Transmittal Letter pursuant to which the UEC Certificates were surrendered indicated that "[n]o alternative, conditional or contingent deposits of the Warrants will be accepted." (Transmittal Letter § 4(b) at 6.) The resulting UEC Certificates also explicitly stated that they merged "all prior . . . agreements" between the parties and that "[n]either of the parties . . . shall be bound by any representations, warranties, covenants or other understandings . . . other than as expressly provided for or referred to herein." (UEC Certificate § 12 at 7-8.)

Plaintiffs' argument that the UEC Certificates improperly omitted terms of the Concentric Warrants is unavailing. First, plaintiffs relinquished their right to raise this argument when they surrendered their Concentric Warrants pursuant to the clear language of the UEC Certificates. But in any event, it is undisputed that the UEC Certificates were issued in connection with a merger, which is defined as a "Fundamental Transaction" under the Concentric Warrants. All necessary procedures for a "Fundamental Transaction" were provided in this instance.

B. <u>"Effective Price" Paid</u>

In order for plaintiffs to prevail on summary judgment (or at trial), there must be <u>some</u> evidentiary basis for a trier of fact to conclude that the "effective price" paid for the stock issued to the directors in 2009 and 2010 was less than $1.00 in violation of the Concentric Warrants' anti-dilution provision. (See

16

Concentric Warrant § 3(b) at 7.) Not only is there no basis for such a finding, but the record plainly supports the opposite.

First, there is no legal basis to conclude that the "effective price" of the stock issuances, as that term is used in the anti-dilution provision at issue, is equivalent to the "purchase price," which was nominal. Inclusion of the term "<u>effective</u> price" in the Concentric Warrant's anti-dilution provision unambiguously suggests that the nominal $0.001 purchase price should be adjusted to take into account aggregate consideration. (Concentric Warrant § 3(b) at 7 (emphasis added).)

Here, the aggregate consideration for the stock Concentric issued in 2009 unquestionably included the officers' and directors' continued management services. And "when parties set down their agreement in a clear, complete document, their writing should as a rule be enforced according to its terms." <u>W.W.W. Assoc.</u>, 77 N.Y.2d at 162; <u>see also</u> <u>Lockheed Martin Corp.</u> 639 F.3d at 69 (holding that when the parties' intent is unambiguous, the contract "must be enforced according to the plain meaning of its terms.") (citations omitted). It is obvious that the officers' and directors' continued service was of significant and important value to the company, and that the stock was the currency through which the services were managed.[6] The 2009 shares vested over three years—further supporting their role as a

---

[6] Defendants correctly note that according to plaintiffs' definition, the disputed shares were issued for a collective "effective price" of only a few hundred dollars. (Defs.' Mem. at 1.) Given that the stock-based compensation was clearly issued as a retention tool (and indeed, in lieu of certain cash-based payment to which the directors were otherwise entitled), plaintiffs' calculation makes no sense. Further, plaintiffs have argued in this litigation that the disputed shares—despite their nominal "effective price"—entitle them to UEC shares worth tens and perhaps hundreds of <u>millions</u> of dollars. But that absurd result is occasioned only by a strained and counter-textual reading of the term "effective price," and further belies plaintiffs' arguments here.

17

retention mechanism (the Board Minutes for this issuance further reflects the role of the stock as a retention tool).

Plaintiffs' focus on the nominal cash amount tendered by the officers and directors as equivalent to the "effective price" referenced in the anti-dilution provision is misguided. Such focus ignores the plain meaning of "effective" as including more than a nominal price term and including aggregate consideration. Plaintiffs' additional argument that prior agreements already required ongoing provision of services ignores the undisputed reality of what was occurring at the Company at that time. Concentric lacked cash and was in danger of having its officers and directors walk out; pursuant to the terms of their agreements, the officers and directors were free to resign at any time. Under these circumstances, the issuance of stock that the officers and directors viewed as having real value was a sensible and not uncommon business decision. Concentric's cost accounting for the stock issuances as far above $1.00 per share is entirely consistent with this.

The 2010 issuance is similar. In April 2010, the company needed to be able to address unpaid fees that amounted to hundreds of thousands of dollars. The "effective price" must take into account the value of what amounted to substantial debt forgiveness in exchange for shares. Plaintiffs have not proffered any amount attributable for the debt forgiveness—leaving the amounts proffered by defendants as the sole evidence: (1) $3.00 per share for unpaid compensation earned in 2008 (based on the price at which Concentric shares sold in 2008); (2) $1.22 per share for unpaid compensation earned through most of 2009 (based on the $1.22 per share

18

stock conversion price in the debentures that Concentric sold in May 2009); and

(3) $1.25 per share for unpaid compensation earned from late 2009 through March 2010 (an agreed price that rounded up the May 2009 debenture price).

In sum, it is clear that any interpretation of "effective price," as that term is used in the anti-dilution provision of the Concentric Warrants, must include aggregate consideration. That is the unambiguous interpretation of the contractual language, and plaintiffs have not provided any evidence tending to suggest that the parties intended "effective price" to be equivalent to the nominal "par value" that officers and directors paid for their stock allocations (and even if they had, such evidence might not be cognizable in the face of the unambiguous nature of the Concentric Warrants' language). The only evidence in the record that takes into account aggregate consideration is that proffered by defendants. Plaintiffs' arguments are insufficient to rebut such evidence. Because the "effective price" of the stock issuances in dispute was greater than $1.00, the anti-dilution provision was never triggered, and defendants' motion for summary judgment must be GRANTED.

I. CONCLUSION

For the reasons set forth above, defendants' motion for summary judgment is GRANTED, and plaintiffs' motion is DENIED.

The Clerk of Court is directed to terminate the motions at ECF Nos. 107 and 111 and to terminate this action.

SO ORDERED.

Dated: New York, New York
March 2, 2018

_____
KATHERINE B. FORREST
United States District Judge